**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| **ALCOA, INC. and REYNOLDS METALS** | § | |
| **COMPANY,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO. V-02-84** |
| **v.** | § | |
| | § | |
| **WHITTAKER CORPORATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are the recommendations of Special Master M.A. "Mickey" Mills regarding various disputes attending the parties' efforts to convert a formal list of settlement terms into a final settlement agreement in the above-styled civil action.  Having carefully reviewed the Special Master's recommendations, the objections and responses thereto of the parties, the entire record, and the applicable law, the Court is of the opinion that the Special Master's recommendations should be adopted and that the parties should (1) execute final settlement papers in their presently proposed form and (2) submit closing papers to the Court within thirty days of the entry of this order.

**Background**

Third-Party Plaintiffs and Cross-Defendants Alcoa and its subsidiary, Reynolds, and Third-Party Defendant and Cross-Plaintiff Whittaker, are the only litigants remaining in this dispute centered around the remediation and cleanup of a chemical solvent called trichloroethylene (TCE) in and around the site of a former aluminum extrusion plant in El Campo, Texas, that had been, at one time or another, owned by all three parties and/or their predecessor or successor entities.  The original plaintiffs in the underlying civil action were a number of individuals who lived near the plant who claimed that Reynolds and Alcoa were liable for property damages and personal injuries that allegedly resulted when TCE  from the plant was permitted to seep into the soil and contaminate the water table.  The original

plaintiffs voluntarily dismissed their claims against Alcoa and Reynolds in order to re-file and consolidate their claims with numerous others before a state court in Wharton County, Texas. At the time those original claims were dismissed, however, this Court had already granted Reynolds and Alcoa leave to file their third-party complaint for contribution against Whittaker, which owned the plant immediately before them.

On March 8, 2006, the parties notified the Court that they had agreed to settle their dispute in lieu of trial and memorialized that agreement in the form of a binding term sheet that was to be incorporated into a final settlement agreement. Dkt. No. 116. The parties also agreed that if they were unable to produce a final settlement agreement from the term sheet within 15 days, they would submit any issues in dispute to the Court. *Id.* Shortly thereafter, the parties notified the Court that they had been unable to do so and asked the Court resolve the dispute. With the approval of the parties, the Court appointed Mills, who had mediated the talks that resulted in the term sheet, as Special Master. Dkt. Nos. 18 & 120. The Court ordered Mills to make recommendations to the Court concerning the parties' dispute over the term sheet. Dkt. No. 121. In correspondence to the Court dated April 20, 2006, Mills advised that he had met with the parties and had reached a number of conclusions regarding the form of the final settlement agreement that he therein commended to the Court.

**Analysis**

There are two instruments that figure in the resolution of the remaining dispute between the parties regarding settlement: the term sheet, which is also referred to as the Basic Settlement Agreement, and the Final Settlement Agreement, which is the proposed formal settlement agreement incorporating the terms of the term sheet. Moreover, there appears to be no dispute that the term sheet is – as there has been no suggestion to the contrary – a binding contract that was executed by the parties on March 7, 2006. As contemplated, the term sheet was to (1) reflect the parties' agreement as to the material

2

terms and (2) serve as an agreement between the parties to incorporate those material terms into the Final Settlement Agreement.  In general, the basic structure of the material terms appears to call for Whittaker to take control of the ongoing state-supervised cleanup operations at the site and split the costs with Reynolds.  The first paragraph of the term sheet, for instance, calls for Whittaker to apply to the Texas Commission on Environmental Quality (TCEQ) to be added along with Reynolds as a party responsible for ongoing cleanup efforts at the site under TCEQ's Voluntary Cleanup Program (VCP) Project No. 538.[1]  Term Sheet ¶ 1.  The term sheet also calls for Whittaker to bear most of the costs associated with (1) preparing the plan for the VCP project at the site and (2) obtaining a VCP completion certificate from TCEQ certifying that state regulators are satisfied that the project has been completed.  Term Sheet ¶ 3(b).  Moreover, the term sheet also provides that "Whittaker shall conduct and control the performance of remediation and diligently pursue the same to completion in accordance" with state law.  Term Sheet ¶ 1.  The third paragraph of the term sheet addresses how remediation costs are to be distributed between Whittaker and Reynolds.  Whittaker's costs are described, in relevant part, as follows:

> 3.      Whittaker to pay:
>
>         ...
>
>         (b)     65% of future response costs, i.e. those response costs incurred after March 7, 2006, related to the site.  "Future Costs" includes all out of pocket, third-party (but no internal overhead) environmental remediation, investigation, and response costs reasonably required to address environmental contamination of the Site with TCE and its degradation products to achieve compliance with applicable cleanup

---

[1]TCEQ's Voluntary Cleanup Program (VCP) is an incentive-based program by which owners of contaminated sites are encouraged to engage in voluntary cleanup efforts in exchange for the ability to shield future non-responsible owners from liability.  Two primary benefits of the program is that contamination at industrial sites such as dry cleaning and automotive operations and manufacturing facilities such as the former aluminum plant at the center of this dispute will not prevent the sites from being sold to new owners, while at the same time ensuring that cleanup efforts are completed to the satisfaction of state regulators.

standards under environmental laws and rules, including but not limited to costs to prepare and obtain approval of a RAP and all such costs to perform and complete an approved RAP and obtain a VCP Certificate of Completion. An "approved" RAP is one approved by TCEQ. Also included in Future Costs are on-going O&M for SVE system, monitoring well installation/sampling, access, and similar costs reasonably incurred in environmental cleanups.

Term Sheet ¶ 3(b). Reynolds' costs are succinctly described in the following paragraph as "35% of Future Costs as defined" in ¶ 3(b). The parties also agreed via the term sheet to procedures for the execution of mutual releases (¶ 5), reimbursements (¶ 6), arbitration of disputes over post-settlement cleanup (¶ 7), and the execution of a "written, formal settlement agreement [that] in good faith ... reflects the provisions set forth in this term sheet" (¶ 15).

After signing the term sheet and submitting it to the Court, the parties apparently balked at executing the Final Settlement Agreement when Whittaker proposed additional language that was necessary, in its view, to clarify the description of the costs to be born by Whittaker in the third paragraph of the term sheet. Specifically, Whittaker argues that the third paragraph of the term sheet should be reformed in the Final Settlement Agreement to clarify that Whittaker's obligations will be limited to 65 percent of the costs associated with the remediation of "TCE and its degradation products," but shall not include any other hazardous pollutants that may be found to have contaminated the site. As Whittaker helpfully suggests, "the issue may be described as 'TCE-only' versus 'unlimited.'" Interestingly, Whittaker does not claim that the term sheet is ambiguous – indeed, Whittaker unequivocally states its position that the term sheet is unambiguous – but claims nonetheless that additional language is needed to faithfully reflect that Whittaker's share of the costs was to be "TCE-only." Reynolds agrees that the term sheet is unambiguous but opposes adding Whittaker's reform language on grounds that the term sheet clearly reflects Whittaker's agreement to cover 65 percent of the cleanup costs related to all hazardous pollutants contaminating the site,

4

including TCE.  In other words, Reynolds' takes the "unlimited" view.  The Special Master agreed with Reynolds and recommends that the Court order the parties to sign the Final Settlement Agreement, which simply incorporates the term sheet by reference and as-written.

As is often the case in this type of dispute, neither party takes the position that the term sheet is ambiguous, yet both parties believe that it means something different.  Moreover, as the parties are well aware, contract law provides that unless the Court concludes that the term sheet is ambiguous, despite both parties' positions to the contrary, then it is not necessary to go beyond that agreement and consider the dueling accounts of the negotiations and/or any predecessor drafts. Finally, as Whittaker correctly points out, pursuant to Rule 53 of the Federal Rules of Civil Procedure, the recommendations of the Special Master are just that – mere recommendations; and the Court is not obligated to afford any deference thereto.

Having carefully reviewed the term sheet, the Court concludes that it is not ambiguous and, furthermore, that it clearly reflects the parties intentions that all future costs related to VCP Project No. 538 are to be split between the parties, 65 percent by Whittaker and 35 percent by Reynolds. In other words, borrowing Whittaker's description of the dispute, the Court reads the term sheet as providing for both parties to cover "unlimited" cleanup costs, not just "TCE-only."   The primary reason that the Court reaches this conclusion is that it disagrees with Whittaker about the meaning of the language in ¶ 3(b) that Whittaker argues limits its obligations to "TCE-only."   Whittaker correctly points out that ¶ 3(b) provides that future costs "includes ... response costs reasonably required to address environmental contamination of the Site with TCE and its degradation products ...."  Term Sheet ¶ 3(b).  Whittaker's position is that the word "includes" should be narrowly and restrictively construed to mean that those components of future costs that follow are the only

5

components of which Whittaker will be responsible for 65 percent.  The Court disagrees.

The word "includes" has "traditionally introduced a non-exhaustive list."  BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 44 (Oxford University Press) (2003).  Moreover, the Court notes that a cursory search of the Westlaw database returns numerous opinions in which federal courts in a variety of contexts have interpreted the term non-exhaustively, including: *Cobell v. Norton*, 240 F.3d 1081, 1100 (D.C. Cir. 2001) ("It is hornbook law that the use of the word including indicates that the specified list ... that follows is illustrative, not exclusive."), *quoted with approval in Cox v. City of Dallas*, 256 F.3d 281, 293 (5th Cir. 2001); *see also U.S. v. Vitillo*, Nos. 05-4330, 05-4331, 05-4332, 2007 WL 1805332, at *5 (3rd Cir. June 25, 2007) ("We reject this argument as well because the § 666(d)(1) list that 'includes' the terms 'servant,' 'employee,' 'partner, director, officer, manager, and representative' is, by it own plain language not exhaustive."); *In re Kunz*, No. 06-4014, 2007 WL 1600429, at *5 (10th Cir. June 5, 2007) ("Courts have held that the use of the word 'includes' in this section indicates that Congress did not intend for the categories listed to be exclusive.  Instead the categories are illustrative rather than exhaustive.") (citation omitted); *U.S. v. Cornelio-Pena*, 435 F.3d 1279, 1284 (10th Cir. 2006) (in parlance of sentencing guidelines, "the term 'includes' is not exhaustive") (citation omitted); *U.S. v. Wyatt*, 408 F.3d 1257, 1261 (9th Cir. 2005) ("The use of the word 'includes' suggests the list is non-exhaustive rather than exclusive.") (citation omitted). *U.S. v. Cianci*, 378 F.3d 71, 79 (1st Cir. 2004) (The term's flexibility is denoted by the use of the word 'includes' rather than 'means' or 'is limited to'; it does not purport to be exhaustive.") (citation omitted).

Any lingering confusion about whether Whittaker's obligations are to extend beyond the realm of "TCE and its degradation products" is cleared up by the balance of the language in ¶ 3(b)

of the term sheet.  For instance, ¶ 3(b) clearly reflects the parties' intent that Whittaker would pay 65 percent of the costs to "perform and complete an 'approved' RAP [or Response Action Plan] and obtain a VCP Certificate of Completion.  An 'approved' RAP is one approved by TCEQ."  Term Sheet ¶ 3(b).  This is a further indication to the Court that the parties understood that some of the control over the scope of their cleanup efforts would be delegated to and therefore subject to approval by state regulators at TCEQ.  Whittaker's agreement to pay 65 percent of the costs of "obtain[ing] a VCP Certificate of Completion" would appear to be an acknowledgment that TCEQ would have some say over whether Whittaker and Reynolds had acquitted themselves with respect to VCP Project 538.  In other words, nothing in ¶ 3(b) appears to give Whittaker any recourse if TCEQ refused to grant a completion certificate because contaminants other than "TCE and its degradation products" had not been  satisfactorily remediated.  Rather, ¶ 3(b) clearly requires that Whittaker pay for its share of all cleanup necessary to secure such a completion certificate.

Finally, Whittaker's argument that the definition of the terms "El Campo Aluminum Company Site" and "Site" in ¶ 2 of the term sheet also supports their "TCE-only" position is a non-issue.  That paragraph provides that those terms "shall include the soils of the former aluminum plant and the groundwater plume underlying such plant site and adjoining areas that are impacted by TCE and its degradation products."  Term Sheet ¶ 2.  Aside from its susceptibility to the same critique as ¶ 3(b) regarding the term "include," ¶ 2 accomplishes nothing more than to define the geographic area within which the cleanup work called for in ¶ 3(b) will occur.  It is clearly expansive and clearly intended to encompass the entire site of the former plant.  Moreover, nothing exempts Whittaker from paying its share of the work described in ¶ 3(b) so long as that work occurs within the area described in ¶ 2.  Any non-TCE contaminants that have polluted the same area as

"TCE and its degradation products" would appear to be within Whittaker's duties under the term sheet.

Based on the foregoing, the Court is of the opinion that the Special Master correctly concluded that no further language is necessary to clarify that Whittaker is responsible for 65 percent of all cleanup costs associated with the site.  Accordingly, the parties shall execute the Final Settlement Agreement as written, unless the passage of time since this dispute was submitted to the Court occasions the need for minor changes, and submit closing/dismissal papers to the Court in accordance therewith within twenty days.

It is so **ORDERED**.

**SIGNED** on this 30th day of September, 2007.


JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE